# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**ERIKA M. LANGENBACH,**

    **Plaintiff,**

    **v.**
                                                   **Case No. 12-CV-1019**

**WAL-MART STORES, INC.,**

    **Defendant.**

---

## DECISION AND ORDER ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

---

Erika M. Langenbach ("Langenbach") brings this lawsuit against Wal-Mart Stores, Inc. ("Wal-Mart") alleging violations of the Family and Medical Leave Act ("FMLA"), sex discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII") and discriminatory pay under the Equal Pay Act.[1] Wal-Mart moves for summary judgment on all of Langenbach's claims. For the reasons that I explain in this opinion, Wal-Mart's motion for summary judgment is granted.

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable

---

[1] In her response brief to Wal-Mart's motion for summary judgment, Langenbach stated that she has chosen not to pursue her claim under the Equal Pay Act. (Pl.'s Br. at 18 n.9, Docket # 43.) As such, the Court will not address that claim.

substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc.,Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## UNDISPUTED FACTS

Erika Langenbach was hired in September of 1998 as a third-shift stocker at the Wal-Mart store located in Mukwonago, Wisconsin. (Def.'s Proposed Findings of Fact ("DPFOF") ¶ 5, Docket # 37 and Pl.'s Response to DPFOF ("Pl.'s Resp.") ¶ 5, Docket # 45.) In 1999, Langenbach requested and was granted a transfer to the Wal-Mart store located in Saukville, Wisconsin. (DPFOF ¶ 6 and Pl.'s Resp. ¶ 6.) Shortly thereafter, Langenbach was promoted to the Jewelry Department Sales Coordinator position and received a

2

pay raise. (*Id.*) In 2001, Langenbach received another promotion to Jewelry Department Manager and received another pay raise. (DPFOF ¶ 7 and Pl.'s Resp. ¶ 7.) In 2004, while she was employed as Jewelry Department Manager, Langenbach requested and was granted FMLA leave for back surgery. (DPFOF ¶ 8 and Pl.'s Resp. ¶ 8.) In February 2008, Langenbach was promoted into Wal-Mart's Management-in-Training Program. (DPFOF ¶ 9 and Pl.'s Resp. ¶ 9.) Langenbach was admitted into the program by Joanne Massopust ("Massopust"), the Market Human Resources Manager for that Market. (DPFOF ¶ 10 and Pl.'s Resp. ¶ 10.) In April 2008, Langenbach successfully completed the Management-in-Training Program and was promoted to an Assistant Store Manager position in West Bend, Wisconsin. (DPFOF ¶ 11 and Pl.'s Resp. ¶ 11.)

The essential functions of Langenbach's Assistant Manager position included: ensuring compliance with company policies and procedures by holding associates accountable; developing and implementing action plans to correct deficiencies; providing direction and guidance on executing company programs and strategic initiatives; and upholding Wal-mart's "open door policy" by meeting with associates and listening to concerns. (DPFOF ¶ 12 and Pl.'s Resp. ¶ 12.) When Langenbach began working as an Assistant Manager at the West Bend Store in April 2008, Langenbach was assigned to the day shift and approximately one year later in April 2009, she was rotated to the overnight shift. (DPFOF ¶ 14 and Pl.'s Resp. ¶ 14.)

In 2009, Langenbach received an annual evaluation for her performance as an Assistant Manager for the 2008/2009 review period, which she signed. (DPFOF ¶ 16 and Pl.'s Resp. ¶ 16.) Langenbach received an overall "Solid Performer" rating on that 2009 evaluation; however, the evaluation identified a number of "opportunities" where she needed to

3

show improvement, including the following: "Need to be more authoritative;" "Don't let associates run your areas;" "You are the leader - be more assertive;" "More accountability with associates;" "Erika needs to work on her time management skills;" and "Plan your day out so you are not staying late to complete notes or projects given." (DPFOF ¶ 17 and Pl.'s Resp. ¶ 17.) In June 2009, Langenbach was placed on a Performance Improvement Plan ("PIP"). (DPFOF ¶ 19 and Pl.'s Resp. ¶ 19.) The 2009 PIP noted the following issues: "Since beginning as the third shift Assistant we have received several open doors from associates and other members of management concerning the lack of leadership and direction from Erika;" and "Lack of leadership, lack of follow-up, pushing off decisions on associates, spending to [sic] much time in the office not enough on sales floor, not following overnight Assistant manager routine, professionalism." (DPFOF ¶ 20 and Pl.'s Resp. ¶ 20.) Wal-Mart never followed through with any follow-up meetings and this PIP was ultimately terminated. (Pl.'s Additional Proposed Findings of Fact ("PAPFOF") ¶ 23, Docket # 44 and Defendant's Response to PAPFOF ("Def.'s Resp.") ¶ 23, Docket # 50.)

If an individual successfully completes a PIP, the PIP is not held against the employee; it is effectively a clean slate. (DPFOF ¶ 21 and Pl.'s Resp. ¶ 21.) Around January 2010, Langenbach returned to the day shift. (DPFOF ¶ 22 and Pl.'s Resp. ¶ 22.) Wal-Mart alleges Langenbach received a "Coaching for Improvement" document on January 21, 2010; however, Langenbach does not recall receiving this and testified that she had never seen the form prior to her deposition. (DPFOF ¶ 23 and Pl.'s Resp. ¶ 23.) The January 2010 Coaching identified a number of deficiencies in Langenbach's performance, including the following: "Erika is not following management routines and has fail [sic] to finish some of her operation duties; part-time full-time exceptions being done on time. Follow up on turn-

4

over notes left from other asst. mgrs and writing turnover notes." The Coaching noted that the next level of discipline if Langenbach's problems continued was "written up to and including termination." (DPFOF ¶ 24 and Pl.'s Resp. ¶ 24.)

In April 2010, Langenbach received her annual review for the review period of February 1, 2009 through January 31, 2010. (DPFOF ¶ 25 and Pl.'s Resp. ¶ 25.) Langenbach received an overall performance rating of "Solid Performer." (PAPFOF ¶ 28 and Def.'s Resp. ¶ 28.) Langenbach's overall competency score on her April 2010 review was 2.63 out of 5, and her overall competency rating was "Development Needed." In addition, Plaintiff received "Development Needed" ratings on several specific competencies, including "Thought Leadership: Judgment: Use Appropriate Judgment," "Results Leadership: Planning and Improvement: Plan and Pursue Team-Based Improvement;" and "People Leadership: Talent: Supervise Associates." (DPFOF ¶ 26 and Pl.'s Resp. ¶ 26.) In the "Managers Comments" section of the April 2010 review, Langenbach's Store Manager, Mike Dooley ("Dooley"), noted that "[o]ver the last qrt. She has been very distracted and not focused on her work she has struggled with attendance, execution of notes, touring and compliance to overnight stocking program. We need to see a complete turn around with emphasis on SOTC and sense of urgency and time management." (DPFOF ¶ 27 and Pl.'s Resp. ¶ 27.) In the "Strengths and Opportunities (Manager Comments)" section of the April 2010 review, Dooley noted that "Erika struggles with time management and organizational skills," "[n]eed to hold underperforming associates accountable," and "needs to be more vocal in meetings with management and associates." (DPFOF ¶ 28 and Pl.'s Resp. ¶ 28.)

In or about April 2010, Langenbach went to the doctor and it was determined that she had a cyst on her kidney and fibroid tumors in her uterus. (DPFOF ¶ 31 and Pl.'s Resp.

5

¶ 31.) On July 29, 2010, Langenbach submitted a written request for continuous FMLA leave for the period of July 30, 2010 through August 26, 2010. (DPFOF ¶ 35 and Pl.'s Resp. ¶ 35.) Along with her written request, Langenbach provided a certification form from her medical provider, which indicated that she was scheduled for surgery on July 30, 2010, and that she would need to be off of work for "2 – 4 weeks." (DPFOF ¶ 36 and Pl.'s Resp. ¶ 36.) Wal-Mart granted Langenbach's request for FMLA, and the approval form was signed by Dooley on July 30, 2010. (DPFOF ¶ 37 and Pl.'s Resp. ¶ 37.) Several days before her scheduled return to work on August 26, 2010, Langenbach began experiencing complications with the incision from her surgery. (DPFOF ¶ 38 and Pl.'s Resp. ¶ 38.) At that time, Langenbach had a conversation with Massopust regarding the possibility of extending her leave, and whether she could work "part time" until the surgical incision was healed. (DPFOF ¶ 39 and Pl.'s Resp. ¶ 39.) Langenbach's continuous FMLA leave was extended by Wal-Mart through September 13, 2010, and she returned to work on September 13, 2010. (DPFOF ¶ 43 and Pl.'s Resp. ¶ 43.) Langenbach provided a certification form from her medical provided which indicated that she could return to work on September 13, 2010 without restrictions. (DPFOF ¶ 45 and Pl.'s Resp. ¶ 45.)

When Langenbach returned to work, she was assigned to work the overnight shift. (DPFOF ¶ 46.) However, Langenbach alleges that she was assigned to work the overnight shift while she was on FMLA leave. (Pl.'s Resp. ¶ 46.) At some point after Langenbach was fully released to return to work, she had a conversation with her supervisor, Courtney Wilcox ("Wilcox"), where she raised some concerns regarding her current medical condition. (DPFOF ¶ 51 and Pl.'s Resp. ¶ 51.) A week or two after she returned from leave, Langenbach received her mid-year performance evaluation. (DPFOF ¶ 54 and Pl.'s Resp. ¶ 54.)

6

Langenbach received an Overall Performance Rating of "Development Needed" on her mid-year evaluation, and an Overall Competency Rating of 2.26 out of 5.0. (DPFOF ¶ 58 and Pl.'s Resp. ¶ 58.) In addition, Langenbach received "Development Needed" ratings on several specific competencies, including "Thought Leadership: Judgment: Use Appropriate Judgment," "Results Leadership: Customer Centered: Focus on the Customer," "Results Leadership: Planning and Improvement: Plan and Pursue Team-Based Improvement" and "Company Initiative: Associate Engagement." (DPFOF ¶ 59 and Pl.'s Resp. ¶ 59.) Langenbach received a "Below Expectations" rating on the competency of "People Leadership: Talent: Supervise Associates." (DPFOF ¶ 60 and Pl.'s Resp. ¶ 60.) In the "Managers Comments" Section of the mid-year evaluation, Dooley noted that "Erika has not been showing leadership skills that is [sic] expected from her. You need to be the leader we expect you to be. We have received open doors on her lack of follow-up with associates . . . She is not focused at [sic] the tasks she is expected to do." (DPFOF ¶ 61 and Pl.'s Resp. ¶ 61.) In the "Strengths and Opportunities (Manager Comments)" section of the mid-year evaluation, Dooley noted that Langenbach "[n]eeds to be more focused at work," "better follow-up on notes given," " better sense of urgency regarding your job and expectations," "organization and planning needs to improve," and "need to be a leader to your associates." (DPFOF ¶ 62 and Pl.'s Resp. ¶ 62.)

In October 2010, Langenbach was placed on another PIP. (DPFOF ¶ 64 and Pl.'s Resp. ¶ 64.) The PIP was delivered to Langenbach on October 15, 2010 by Wilcox and Dooley. (DPFOF ¶ 68 and Pl.'s Resp. ¶ 68.) Langenbach was given the choice to either continue on the PIP or to step down to a Zone Manager position. (DPFOF ¶ 69 and Pl.'s Resp. ¶ 69.) Langenbach chose to continue on the PIP. (DPFOF ¶ 70 and Pl.'s Resp. ¶ 70.) The

7

October PIP identified a number of performance/behavior concerns, including "Time management – not organized to be able to give associates clear cut deadlines on calendar events, etc. Too many things left until the last minute. You get focused on one task and forget or lose track of what else is going on in the store," "Not consistent with company policies or follow thru [sic] on company policies," "Not consistent with execution of assistant manager routines." (DPFOF ¶ 71 and Pl.'s Resp. ¶ 71.) Sometime during the PIP, Langenbach and Massopust had a conversation regarding Langenbach's performance and Langenbach told Massopust that she believed her past poor performance was due to her medical condition. (DPFOF ¶¶ 75-76 and Pl.'s Resp. ¶¶ 75-76.)

On November 17, 2010, Langenbach met with Wilcox and Dooley for the first PIP follow-up session. (DPFOF ¶ 80 and Pl.'s Resp. ¶ 80.) In the "Progress" section of the follow-up document, Langenbach was rated as "Below Expectations." (DPFOF ¶ 81 and Pl.'s Resp. ¶ 81.) The "Summary" section of the follow-up document identified areas that were still below expectations, including the following: "time management," "consistency of management routines," and "consistency of policies." (DPFOF ¶ 82 and Pl.'s Resp. ¶ 82.) In the "Reviewing Manager's Overall Comments on Progress or Lack of Progress" section, Wilcox identified a number of areas that still needed improvement, including: "As an assistant manager, Erika needs to learn to provide better leadership to her associates," "Erika still needs to gain stronger knowledge of basic Walmart routines and expectations," "Erika needs to learn to be a total store manager, not getting easily sidetracked by one project or note," and Erika needs to react to the demands of the store – make decision and provide clear direction to the associates." (DPFOF ¶ 83 and Pl.'s Resp. ¶ 83.)

8

On January 27, 2011, Langenbach met with Wilcox and Dooley for the second PIP follow-up session. (DPFOF ¶ 85 and Pl.'s Resp. ¶ 85.) In the "Progress" section of the follow-up document, Langenbach was rated as "Below Expectations." (DPFOF ¶ 87 and Pl.'s Resp. ¶ 87.) The "Summary" section of the follow-up document identified areas that were still below expectations, including the following: "time management," "consistency of routines," and "consistency of policies." (DPFOF ¶ 88 and Pl.'s Resp. ¶ 88.) In the "Reviewing Manager's Overall Comments on Progress or Lack of Progress" section, Wilcox identified a number of areas that still needed improvement, including: "Erika needs to find her voice and have confidence – she has the knowledge but doesn't always think things thru [sic]," "Erika has to learn to have a plan and a back up plan for every single night to ensure that all goals are met," and "[a]t this point in Erika's Performance Improvement Plan she is still not meeting the minimum expectations for her position." (DPFOF ¶ 89 and Pl.'s Resp. ¶ 89.)

On March 1, 2011, Langenbach met with Wilcox and Dooley for the third PIP follow-up session. (DPFOF ¶ 91 and Pl.'s Resp. ¶ 91.) In the "Progress" section of the follow-up document, Langenbach was rated as "Below Expectations." (DPFOF ¶ 92 and Pl.'s Resp. ¶ 92.) The "Summary" section of the follow-up document identified areas that were still below expectations, including the following: "Erika has improved on delegation but still lacks the time management skills to follow up in a timely manner with her associates." (DPFOF ¶ 93 and Pl.'s Resp. ¶ 93.) In the "Reviewing Manager's Overall Comments on Performance Improvement" section, Wilcox noted that: "Erika failed to meet company expectations," "Erika does not have the ability to keep up with her routines on a daily basis," "Erika still doesn't fully grasp that she is responsible for the entire store and gets focused on

9

little tasks," and "Erika was given many tools advice on how to improve, yet chose not to listen." (DPFOF ¶ 94 and Pl.'s Resp. ¶ 94.)

Langenbach's employment with Wal-Mart was terminated effective March 1, 2011. (DPFOF ¶ 96 and Pl.'s Resp. ¶ 96.) At the time of her termination, Langenbach did not believe she was qualified to be a co-manager (i.e., shift manager), store manager, or district manager; however, she believed that she could be qualified for those positions in the future. (DPFOF ¶ 97 and Pl.'s Resp. ¶ 97.)

## ANALYSIS

Langenbach makes three claims. First, she argues that Wal-Mart unlawfully interfered with her ability to exercise her rights under the FMLA. Second and relatedly, she argues that Wal-Mart retaliated against her for taking FMLA leave. Third, she alleges that Wal-Mart discriminated against her on the basis of her sex in violation of Title VII. As indicated earlier, Wal-Mart moves for summary judgment on all three claims. I will address each in turn.

### 1. FMLA Interference

Langenbach argues that Wal-Mart unlawfully interfered with her ability to exercise her rights under the FMLA when it (1) required her to take continuous rather than intermittent leave after her surgeries (from August 26, 2010 through September 13, 2010) and (2) discouraged her from attempting to use additional intermittent FMLA leave after she returned to work on September 13, 2010. (Pl.'s Br. in Opp. to Summ. Judg. ("Pl.'s Br.") at 15, Docket # 43.)

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C.

10

§ 2615(a)(1). To prevail on this claim, the employee must show that: (1) she was eligible for FMLA protection; (2) the employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she provided notice of intent to take FMLA leave; and (5) the employer denied her FMLA benefits to which she was entitled. *De La Rama v. Ill. Dept. of Human Services*, 541 F.3d 681, 686–87 (7th Cir. 2008) (internal citations omitted). The FMLA permits an employee to take leave intermittently or on a reduced schedule when medically necessary. 29 U.S.C. § 2612(b); *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 760-61 (7th Cir. 2008).

In this case, the record does not establish FMLA interference after Langenbach returned to work on September 13, 2010. True, Langenbach may have raised some concerns with Wilcox regarding her medical condition after returning to work. (DPFOF ¶ 51 and Pl.'s Resp. ¶ 51.) But, the record clearly indicates that intermittent leave was not medically necessary after September 13, 2010. Langenbach provided Wal-Mart with certification that she could return to work without restrictions on September 13, 2010. (Declaration of Erik Eisenmann ("Eisenmann Decl.") ¶ 28, Ex. 25, Docket # 38 and 38-25.) Langenbach testified that the reason she asked to extend her original FMLA leave was because of issues with the healing of her incision, and this issue was resolved by September 13, 2010. (Declaration of James H. Kaster ("Kaster Decl.") ¶ 4, Ex. 1, Docket # 46; Deposition of Erika Langenbach ("Langenbach Dep.") at 156-57, Docket # 46-1.) Langenbach further testified that once she was able to return to work without restrictions, she no longer needed intermittent leave. (Langenbach Dep. at 155-56.) Thus, the evidence does not indicate that it was medically necessary for Langenbach to take FMLA leave intermittently after September 13, 2010. In fact, Langenbach provided Wal-Mart with medical documentation indicating she

11

could return to work without restrictions on September 13, 2010. Further, Langenbach herself testified that intermittent leave was unnecessary after September 13, 2010 because the issues with her incision had resolved.

Additionally, Langenbach has failed to produce evidence which would support a reasonable jury verdict that Wal-Mart interfered with her FMLA rights by granting her continuous, rather than intermittent leave, from August 26, 2010 until September 13, 2010. As previously stated, the FMLA permits an employee to take leave intermittently or on a reduced schedule when medically necessary. 29 U.S.C. § 2612(b). Langenbach testified that she never obtained a doctor's certification stating that intermittent leave was medically indicated. (Langenbach Dep. at 156.) While she testified that her doctor would not release her "to do any lifting or anything because that would cause [her incision] to open more," (Langenbach Dep. at 152), this does not provide support for the medical necessity of intermittent leave. Wal-Mart granted her continuous FMLA leave from August 26, 2010 until September 13, 2010, consistent with her prior medical certifications showing her need for continuous leave. Because Langenbach has presented no evidence that intermittent leave was medically necessary either between August 26, 2010 and September 13, 2010 or after September 13, 2010, her FMLA interference claim fails because she cannot establish that she was denied FMLA benefits to which she was entitled.

Because Langenbach's FMLA interference claim fails on the merits, it is unnecessary to address the parties' arguments regarding whether this claim is barred by the applicable statute of limitations.

12

### 2. *FMLA Retaliation*

Next, Langenbach argues that Wal-Mart retaliated against her for taking FMLA leave. Langenbach argues that Wal-Mart took the following retaliatory actions against her: (1) assignment to third shift; (2) providing her with a negative mid-year review; (3) placing her on a PIP within a month of her return from FMLA leave; and (4) terminating her employment on March 1, 2011. (Pl.'s Br. at 6.)

An employee who alleges that her employer retaliated against her for exercising her rights under the FMLA can proceed under the direct or indirect methods of proof familiar in employment discrimination litigation. *Smith v. Hope School*, 560 F.3d 694, 702 (7th Cir. 2009). An employee proceeding under the direct method must demonstrate that her employer intended to punish her for requesting or taking FMLA leave. *Id.* The indirect method requires the employee to produce evidence that she was treated differently from similarly situated employees who did not request FMLA leave, even though she was performing her job satisfactorily. *Id.*

### 2.1 Direct Method

Under the direct method, Langenbach must present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two. *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 593 (7th Cir. 2008). The parties do not contest that Langenbach engaged in a statutorily protected activity by taking medical leave in July 2010. (Pl.'s Br. at 7 n.5.) Thus, under the direct method of proof, I must consider whether Wal-Mart took a materially adverse action against Langenbach and whether there is a causal connection between the materially adverse action and Langenbach's protected activity.

13

*Materially Adverse Employment Action*

While Wal-Mart concedes that Langenbach's termination is a materially adverse action, Wal-Mart contends that Langenbach's assignment to third shift, her negative mid-year review, and her placement on a PIP are not materially adverse actions. I agree. First, regarding Langenbach's change to third shift, she is correct that the FMLA requires that upon return from leave, an employee shall be entitled "to be restored by the employer to the position of employment held by the employee when the leave commenced" or "to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1). She is also correct that the Department of Labor regulations stated that an employee is "ordinarily entitled to return to the same shift or the same or an equivalent work schedule." 29 C.F.R. § 825.215(e)(2). However, this is not a case where an employee was designated to work only the day shift and when she returned from FMLA leave only a night shift position was available. *See, e.g.*, *Hunt v. Rapides Healthcare System, LLC*, 277 F.3d 757, 766-67 (5th Cir. 2001) (finding question of fact that precluded summary judgment as to job equivalency when nurse who was assigned to work only on day shift returned from FMLA leave and was offered a night shift position). Rather, working the night shift was part of an Assistant Manager's job. (*See* Langenbach Dep. at 159.) Langenbach acknowledges that she had previously worked both the day and the night shift as Assistant Manager. (DPFOF ¶ 14 and Pl.'s Resp. ¶ 14.) She also admits that even though she had previously worked the overnight shift, she knew that she would have to go on that shift again at some point. (DPFOF ¶ 48 and Pl.'s Resp. ¶ 48.) Langenbach acknowledges that it was common for Assistant Managers at the West Bend store to work the overnight shift on multiple occasions. (DPFOF ¶ 49 and Pl.'s Resp. ¶ 49.) Although she testified that the As-

14

sistant Managers "were supposed to take turns on third shift" (Langenbach Dep. at 159) and there were other Assistant Managers who had not yet gone on third shift (*id.* at 160-61), she provides no evidence that an Assistant Manager would not go back onto third shift until all other Assistant Managers had completed a rotation on third shift.

Further, although Langenbach testifies that third shift is physically more demanding (Langenbach Dep. at 160) and she believes Wal-Mart "set [her] up to fail by putting [her] on third shift" (*id.* at 229), Langenbach had provided Wal-Mart with medical certification that she could return to work with no restrictions. Thus, even assuming the night shift was more physically demanding, Wal-Mart would have no indication that Langenbach could not do the work. Thus, Langenbach's rotation to third shift was not a materially adverse action.

Next, Wal-Mart argues that performance reviews and PIPs do not qualify as materially adverse actions sufficient to support a retaliation claim. (Def.'s Br. in Supp. of Summ. Judg. (Def.'s Br.") at 12, Docket # 36.) Langenbach contends that, when considered together with the shift change and her termination, the performance review and PIP demonstrate that Wal-Mart acted with discriminatory intent. (Pl.'s Br. at 10.) The Seventh Circuit has stated that negative performance evaluations, standing alone, cannot constitute an adverse employment action, "but could constitute, under the right circumstances, evidence of discrimination." *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998); *see also Davis v. Time Warner Cable of Southeastern Wisconsin, L.P.*, 651 F.3d 664, 677 (7th Cir. 2011) ("Performance improvement plans, particularly minimally onerous ones . . . are not, without more, adverse employment actions."). In *Sweeney*, when addressing a Title VII retaliation claim,[2] the plain-

---

[2] A claim of FMLA retaliation is assessed in the same manner as a claim for retaliation under Title VII. *See Burnett v. LFW Inc.*, 472 F.3d 471, 481 n.5 (7th Cir. 2006).

15

tiff alleged that she was unfairly reprimanded for conduct she either did not engage in or should not have been responsible for. *Id.* The court found that "[a]bsent some tangible job consequence accompanying these reprimands, we decline to broaden the definition of adverse employment action to include them." *Id.* The court noted that the "adverse" employment actions are "two counseling statements, both of which stop short of disciplining [plaintiff] but do admonish her to improve." *Id.* at 556-57. The *Sweeney* court stated that:

> If we interpreted these simple personnel actions as materially adverse, we would be sending a message to employers that even the slightest nudge or admonition (however well-intentioned) given to an employee can be the subject of a federal lawsuit; a simple statutory prohibition against retaliation would be turned into a bizarre measure of extra protection for employees who—though they might genuinely need counseling—at one point complained about their employer. We also would be deterring employers from documenting performance difficulties, for fear that they could be sued for doing so. Employees would be left in the dark as to how they could improve their work performance, and employers would be less able to establish the fact that poor performance, rather than some unlawful motivation, prompted a decision to fire, demote, etc.

*Id.* at 557.

As I indicated earlier, Langenbach's assignment to third shift does not constitute an adverse employment action. Likewise, the negative performance evaluation and the PIP do not constitute adverse employment actions. Even if negative evaluations may ultimately lead to termination, "[s]uch a course [is] not an inevitable consequence of every reprimand." *Oest v. Ill. Dept. of Corrections,* 240 F.3d 605, 613 (7th Cir. 2001). Rather, "job-related criticism can prompt an employee to improve her performance and thus lead to a new and more constructive employment relationship." *Id.* Further, Langenbach has not shown "any immediate consequence of the reprimands, such as ineligibility for job benefits like promotion, transfer to a favorable location, or an advantageous increase in responsibilities." *See id.*

Rather, it is undisputed that upon successful completion of a PIP, it is not held against the employee and is effectively a "clean slate." (DPFOF ¶ 21 and Pl.'s Resp. ¶ 21.)

Wal-Mart also argues that the assignment to third shift, the performance evaluation, and the PIP are time barred. Because I conclude that these actions do not constitute materially adverse employment actions, it is unnecessary to determine whether those actions are time barred.

*Causal Connection*

The only adverse employment action at issue is Langenbach's termination. Langenbach must show a causal connection between the adverse employment action and her protected activity. The causal-nexus element may be met through either a direct admission or through "'a convincing mosaic of circumstantial evidence'" permitting that same inference. *Pagel v. TIN Inc.*, 695 F.3d 622, 631 (7th Cir. 2012) (quoting *Ridings v. Riverside Med. Ctr.,* 537 F.3d 755, 771 (7th Cir. 2008)). The "convincing mosaic of circumstantial evidence" may include suspicious timing, ambiguous statements from which a retaliatory intent can be drawn, evidence of similar employees being treated differently, or evidence that the employer offered a pretextual reason for the termination. *Id.* Langenbach principally argues that the timing of her termination, a little more than five months after returning from leave, establishes a causal connection. (Pl.'s Br. at 11-12.) Langenbach further argues that Wal-Mart's claim of poor performance is mere pretext. (*Id.* at 12.)

This circuit has held that "[s]uspicious timing alone rarely is sufficient to create a triable issue." *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008) (internal quotation and citation omitted). On summary judgment, in particular, "it is clear that mere

17

temporal proximity is not enough to establish a genuine issue of material fact." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004). Further, the inference of causation weakens as the time between the protected expression and the adverse action increases, and then additional proof of a causal nexus is necessary. *Oest*, 240 F.3d at 616. The Seventh Circuit has found a three month interval too long to support an inference of retaliation. *Lewis v. Holsum of Fort Wayne, Inc.*, 278 F.3d 706, 711 (7th Cir. 2002). Thus, the five month period between Langenbach's return from leave and her termination is insufficient, in and of itself, to create an inference of retaliation.

Further, Langenbach does not present evidence that Wal-Mart offered a pretextual reason for the termination; rather, she offers her speculation that "management was annoyed that Plaintiff went on leave" and "trumped up allegations of poor performance and fired her." (Pl.'s Br. at 12.) This is insufficient to establish a causal connection.

As such, Langenbach cannot establish a claim of FMLA retaliation under the direct method of proof.

### 2.2    Indirect Method

Under the indirect method, an employee must establish a *prima facie* case by proving that she (1) engaged in a statutorily protected activity; (2) met her employer's legitimate expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Caskey*, 535 F.3d at 593. Wal-Mart contends that Langenbach cannot meet factor two and four.

*Legitimate Expectations*

In most cases, when a district court evaluates the question of whether an employee was meeting an employer's legitimate employment expectations, the issue is not the employee's past performance but whether the employee was performing well at the time of her termination. *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002). Although indicators of past conduct can be relevant to the question of whether an employee is meeting legitimate expectations, such indicators cannot "demonstrate the adequacy of performance at the crucial time when the employment action is taken." *Fortier v. Ameritech Mobile Comuns. Inc.*, 161 F.3d 1106, 1113 (7th Cir. 1998). The proper inquiry mandates looking at the employee's job performance through the eyes of her supervisors at the time of her termination. *See Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008).

As evidence that she was meeting her employer's legitimate employment expectations, Langenbach offers that that she never received an overall performance rating of "Development Needed" until after she returned from FMLA leave, Wal-Mart never followed through on a PIP for her until after she returned from FMLA leave, and during the October 2010 PIP, her co-managers expressed to her that things were going well. (Pl.'s Br. at 13.) The evidence does show that Langenbach never received an overall performance rating of "Development Needed" until the 2010 mid-year performance evaluation after her return from FMLA leave. However, though the relevant inquiry is Langenbach's performance at the time of her termination, her past performance evaluations shed light on whether Langenbach was meeting Wal-Mart's legitimate expectations. Langenbach's past performance reviews consistently indicate that she struggled in areas of leadership. For example, in her 2008/2009 review that she received in 2009, the review stated that "Erika needs to be more

19

authoritive [sic] with her associates. Be assertive." (Eisenmann Decl., Ex. 23 at 3.) Although Wal-Mart ultimately terminated the June 2009 PIP, Wal-Mart instituted the PIP because of Langenbach's "[l]ack of leadership, [l]ack of follow up, [p]ushing off decisions on associates." (Eisenmann Decl., Ex. 24.) Finally, the performance review for 2009/2010 that Langenbach received in April 2010 gives Langenbach a "Development Needed" rating for several leadership categories and the manager recommended that Langenbach attend leadership seminars. (Eisenmann Decl. ¶ 25, Ex. 22 at 6, Docket # 38-22.)

Thus, when the manager notes in Langenbach's performance review received after she returned from leave in September 2010 that Langenbach "has not been showing proper leadership skills that is expected from her" (Eisenmann Decl., Ex. 21 at 3), this is consistent with past evaluations. In evaluating Langenbach's performance during the October 2010 PIP, immediately prior to her termination, it was noted that Langenbach "still hasn't found her voice and isn't able to carry herself as a leader in this store" despite being given "many tools/advice on how to improve." (Eisenmann Decl. ¶ 21, Ex. 18, Docket # 38-18.)

The only evidence Langenbach offers in support of the fact she was meeting her employer's legitimate expectations at the time of her termination was her own deposition testimony that her co-managers expressed to her that things were going well and that they had no issues with her. (PAPFOF ¶ 60.) Wal-Mart argues this testimony cannot create an issue of material fact because it is inadmissible hearsay. (Def.'s Br. at 10.) I disagree. These statements are admissible under the hearsay exception of admissions by a party opponent, Fed. R. Evid. 801(d)(2)(D). However, this evidence does not create an issue of material fact. First, Langenbach's testimony is that Wilcox and Dan Wilds ("Wilds") told her during her October 2010 PIP that she was "doing great," "doing fine," and they "didn't have any is-

sues with [her]." (Langenbach Dep. at 193.) To begin, what Wilds told her is irrelevant because he was not involved in the decision to terminate her employment. *See Young v. James Green Management, Inc.*, 327 F.3d 616, 622 n.2 (7th Cir. 2003) (recognizing that in the context of employment discrimination cases, the declarant must be involved in the decision making process affecting the employment action involved). Dooley testified that Wilcox, Dooley, and Massopust made the decision. (Kaster Decl. ¶ 4, Ex. 7, Dooley Dep. at 108.)

Although Wilcox's statements would be admissible, the statements that she was "doing great," "doing fine," and there were "no issues" are vague and ultimately not inconsistent with Wilcox's statements in the third follow-up session prior to Langenbach's termination that at the beginning of the PIP Langenbach "made strides to improve her performance as leader . . . but as time progressed [she] failed to meet company expectations." (Eisenmann Decl., Ex. 18.) Because this Court "does not. . . sit as 'super-personnel' to question the wisdom or business judgment of employers, this inquiry ends here," with Langenbach's inability to sustain her burden. *Gates*, 513 F.3d at 689; *see also Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997) (it is not the province of the court to decide whether the employer's reason was wise, fair or correct, so long as it was really the reason). Despite construing the evidence in the light most favorable to Langenbach, based on the documented progression of Langenbach's performance issues with the lack of leadership skills required of an Assistant Manager, a reasonable jury could not conclude that Langenbach was performing her job according to Wal-Mart's reasonable expectations.

*More Favorable Treatment of Other Employees*

Even if Langenbach had established that she was meeting Wal-Mart's legitimate expectations, she has failed to establish that she was treated less favorably than similarly situ-

21

ated employees who did not engage in statutorily protected activity. To assess whether two employees are similarly situated, "a court must look at all relevant factors, the number of which depends on the context of the case." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). "[I]n disciplinary cases-in which a plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited reason-a plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct." *Id.* (internal citations omitted). Typically this involves showing that the employees shared the same supervisor, performance standards, and "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 617-18. That said, "[o]ur similarly situated requirement 'should not be applied mechanically or inflexibly.'" *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 791 (7th Cir. 2007) (quoting *Hull v. Stoughton Trailers, LLC*, 445 F.3d 949, 952 (7th Cir. 2006)).

As comparables, Langenbach states that she was assigned to the third shift even though three other assistant managers had not yet been assigned to this shift. (Pl.'s Br. at 14.) For the reasons stated above, this does not create a issue of material fact as to comparables because the third shift rotation is not a materially adverse employment action thus the fact they had not yet been assigned the third shift does not show they were treated more favorably.

Langenbach also argues that Joe Frankiewicz ("Frankiewicz"), another Assistant Manager at the West Bend store who had not recently taken FMLA leave, was treated more favorably than her because he was guilty of what Massopust described as a "theft" but was only given a coaching, whereas she was placed on the October 2010 PIP. Frankiewicz is not

22

a useful comparator because the two did not engage in similar conduct. Langenbach was placed on the October 2012 PIP because of performance issues; whereas Frankiewicz was disciplined for misconduct. In other words, the question is how did Wal-Mart treat others with similar performance issues to Langenbach. Langenbach cannot establish that Frankiewicz was similarly situated to her.

### 3. *Title VII*

Langenbach alleges that Wal-Mart discriminated against her on the basis of her sex, in violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e–2(a)(1). Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Id.* Thus, there are two primary issues to consider: first, was the purported difference in treatment prompted by Langenbach's sex, and second, did the difference in treatment affect Langenbach's compensation, terms, conditions, or privileges of employment. *Haugerud v. Amery School Dist.*, 259 F.3d 678, 691 (7th Cir. 2001). If there is enough evidence for a reasonable jury to conclude that the plaintiff's sex prompted the disparate treatment (and that the treatment affected the plaintiff's employment in a tangible way), then the case is suited for trial, not summary judgment. *Id.*

A plaintiff can establish discrimination in violation of Title VII using either the direct or indirect method of proof. *Johnson v. General Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 727 (7th Cir. 2013).The direct method requires that the plaintiff provide direct or circumstantial evidence of the employer's discriminatory animus. *Id.* The indirect method, by contrast, requires the plaintiff to follow the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *Id.* at 728. Under

23

the *McDonnell Douglas* framework, after the plaintiff makes a *prima facie* case of discrimination, the burden shifts to the employer to articulate a legitimate non-discriminatory reason for its action. *Id.* Doing so shifts the burden back to the plaintiff to show that the employer's proffered reason is pretext, which then permits an inference that the employer's real reason was unlawful. *Id.*

### 3.1    Direct Method

Under the direct method, the plaintiff must produce either direct or circumstantial evidence that would permit a jury to infer that discrimination motivated an adverse employment action. *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011). Direct evidence is something close to an explicit admission by the employer that a particular decision was motivated by discrimination; this type of evidence is rare, but it "uniquely reveals" the employer's intent to discriminate. *Id.* More common is circumstantial evidence, which "suggests discrimination albeit through a longer chain of inferences." *Id.* (internal citation omitted). A plaintiff can survive summary judgment by producing either type of evidence as long as it creates a triable issue on whether discrimination motivated the employment action. *Id.* Our cases point to three categories of circumstantial evidence: (1) ambiguous statements or behavior towards other employees in the protected group; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (3) evidence that the employer offered a pretextual reason for an adverse employment action. *Id.* A plaintiff need not produce evidence in each category to survive summary judgment. *Id.*

Langenbach argues she was discriminated against based on her sex in the following manner: (1) Wal-Mart delayed her promotion to Assistant Manager and failed to promote

24

her to shift manager or store manager based on her sex; (2) the failure to promote resulted in less pay than her male counterparts; and (3) Langenbach was terminated based on her sex. Langenbach does not suggest that she has an explicit admission from Wal-Mart that it took these actions against her based on her sex. As such, Langenbach must produce circumstantial evidence that would permit a jury to infer that discrimination motivated the adverse employment actions.

*Delayed Promotion and Lower Pay*

Langenbach argues that she worked for Wal-Mart for ten years before being promoted to Assistant Manager while several male employees were promoted to Assistant Manager much quicker. (Pl.'s Br. at 20.) Langenbach also alleges that she was never promoted beyond Assistant Manager, while male employees with similar or inferior qualifications were promoted to shift manager or store manager. Langenbach has failed to produce circumstantial evidence that would permit a jury to infer that Wal-Mart delayed her promotion to Assistant Manager, or failed to promote her beyond Assistant Manager, because of her sex.

Although Langenbach worked for Wal-Mart for ten years prior to her promotion to Assistant Manager, it is undisputed that Langenbach was promoted twice, once in 1999 to Jewelry Department Sales Coordinator (DPFOF ¶ 6 and Pl.'s Resp. ¶ 6) and once in 2001 to Jewelry Department Manager (DPFOF ¶ 7 and Pl.'s Resp. ¶ 7). Langenbach entered the Management-in-Training Program in February 2008. (DPFOF ¶ 9 and Pl.'s Resp. ¶ 9.) Langenbach testified that at the time she entered the Management-in-Training Program, she had been "applying for an assistant manager position probably for over a year." (Langenbach Dep. at 26.) She also testified that she was "applying in [her] own district but couldn't seem

25

to get in my own district"; however, when she applied outside of her district, she "was able to get the West Bend store." (*Id.*) Further, after completing the Management-in-Training program in April 2008, Langenbach was promoted to Assistant Manager. (DPFOF ¶ 11 and Pl.'s Resp. ¶ 11.) Thus, although Langenbach may have worked for Wal-Mart since 1998, she did not apply for an Assistant Manager position until early 2007, or perhaps late 2006 (as she testified that in February 2008 she had been applying for probably over a year). And as soon as she completed the Management-in-Training program, she was promoted to Assistant Manager. Although Langenbach argues the male employees were promoted quicker than her, she did not apply for an Assistant Manager position until 2007 and was promoted as soon as she completed the Management-in-Training program.

Regarding Langenbach's argument that she was never promoted past Assistant Manager in her thirteen plus years of employment with Wal-Mart, Langenbach testified that she was not qualified to be a store manager, comanager, or district manager (though she felt she could have been sometime in the future). (Langenbach Dep. at 209.)

Langenbach's argument that female employees were paid less than male employees is tied to her failure to promote claim. Pursuant to Wal-Mart's pay structure, employees can only receive a pay raise above their current pay band if they are promoted. (Pl.'s Br. at 24.) Because Langenbach has failed to establish direct evidence of discrimination in failing to promote, she cannot show that her lesser pay was based on her sex. Employees in more senior positions, whether male or female, make a higher salary.

*Termination*

Langenbach also argues that she was terminated based on her sex. Her first argument is that she never received a negative performance review prior to going on FMLA leave.

26

This argument conflates her FMLA claim with her Title VII claim and does not establish that her termination was based on her sex. She further argues, as she did on her FMLA claim, that Frankiewicz received lesser discipline for a more serious act of indiscretion than her. However, this is insufficient circumstantial evidence under the direct method of proof, which requires evidence leading directly to the conclusion that an employer was illegally motivated, without reliance on speculation. *Good v. Univ. of Chicago Med. Ctr..*, 673 F.3d 670, 676-77 (7th Cir. 2012); *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003) (stating that circumstantial evidence must point directly to a discriminatory reason for the employer's action). As explained above, Frankiewicz is not directly comparable because he was disciplined for misconduct while Langenbach was terminated for performance issues. Thus, she cannot establish direct evidence of discrimination based on sex in regards to her termination.

### 3.2    Indirect Method

Under the indirect method of proof, a plaintiff can "avert summary judgment" by establishing a *prima facie* case of discrimination under the *McDonnell Douglas* formula. *Lewis v. City of Chicago*, 496 F.3d 645, 650 (7th Cir. 2007). To establish a *prima facie* case of sex discrimination under Title VII, Langenbach must show that (1) she was a member of a protected class; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) the employer treated a similarly situated man more favorably. *See Cullen v. Indiana University Bd. of Trustees*, 338 F.3d 693, 704 (7th Cir. 2003). If Langenbach establishes a *prima facie* case, the burden shifts to Wal-Mart to provide legitimate reasons for the disparity. *See id.* If Wal-Mart provides legitimate reasons, then Langenbach must establish that the proffered reasons are pretextual. *See id.*

27

As an initial matter, there is some confusion as to how the parties view Langenbach's failure to promote claim. Langenbach argues that when a plaintiff uses the indirect method to establish a failure to promote claim, she must show, in addition to the protected class element, that she: (1) is qualified for the position; (2) was rejected for the position sought; and (3) the position was granted to a person outside the protected class who is similarly or less qualified than the plaintiff, citing *Jordan v. City of Gary, Ind.*, 396 F.3d 825, 833 (7th Cir. 2005). Whereas, Wal-Mart argues that because Langenbach was ultimately promoted to Assistant Manager, what she is truly arguing is a "delayed promotion" claim to which there is no relief under Title VII. While the parties have not cited any cases establishing an independent cause of action for a "delayed promotion" under Title VII, courts have considered whether a delayed promotion was an adverse employment action. *See, e.g.*, *Blue v. Dunn Construction Co.*, 453 Fed. Appx. 881 (11th Cir. Nov. 23, 2011) (unpublished) (stating that "[t]his circuit has not yet determined whether a delayed promotion can satisfy the adverse employment action prong"); *Harley v. Paulson*, No. 07-3559, 2008 WL 5189931 (D.N.J. Dec. 9, 2008) (finding that a delay in promotion without retroactive pay may amount to an adverse employment action). Further, beyond her assertion of the delay in her promotion to Assistant Manager, Langenbach also alleges that she was not promoted to any position beyond Assistant Manager. Thus, even if her "delayed promotion" to Assistant Manager did not constitute an adverse employment action, her allegations that Wal-Mart failed to promote her beyond Assistant Manager fall within the purview of a "failure to promote" cause of action.

Even assuming her delayed promotion to Assistant Manager constitutes an adverse employment action, Langenbach has failed to establish a *prima facie* case of sex discrimina-

28

tion. Although she argues that she "applied for promotions to the Assistant Manager and Shift Manager positions yet was repeatedly denied," (Pl.'s Br. at 27), the evidence does not bear this out. Regarding being promoted beyond an Assistant Manager, whether it be to a co-manager (i.e., shift manager), store manager, or district manager, Langenbach has not established that she ever applied for any of these positions. (Langenbach Dep. at 207-208.) Thus, she cannot establish that she was rejected for the position sought. Further, Langenbach admits that she was not qualified for any of those positions, though she believed that she could have been qualified at some point in the future. (Langenbach Dep. at 209.)

Similarly, Langenbach has not established that she was "repeatedly denied" the position of an Assistant Manager. Although she argues in her brief that she met the requirements for an Assistant Manager position in 2002 but was not promoted until six years later, Langenbach testified that at the time she was admitted into the Management-in-Training program in February 2008, she had been applying for an Assistant Manager position "probably for over a year." (Langenbach Dep. at 26.) She further testified that when her managers would tell her she was an exceptional employee and asked her if she would like to move up in the company, "[a]t first I said no because I was happy being what I was, and then - - then I started thinking about it and decided to - - decided to go - - to move up with the company." (Langenbach Dep. at 28.) Thus, even if Langenbach was qualified for an Assistant Manager position in 2002, she did not apply for the position until several years later. Further, although she testified that she had been applying for an Assistant Manager position unsuccessfully for over a year in her own district, she also testified that when she applied for a position outside of her district, she was accepted. (Langenbach Dep. at 26.)

As discussed above, Langenbach's argument regarding disparate pay is actually part of her failure to promote claim. Langenbach argues that when "male comparators were promoted past Plaintiff, they were paid higher wages." (Pl.'s Br. at 28.) She acknowledges that "according to Wal-Mart's pay structure, employees can only receive a pay raise above their current pay band if they are promoted." (*Id.* at 24.) Thus, the male employees Langenbach claims received higher pay than her are not similarly situated to her because they did not hold the same position as her. The evidence indicates that they were paid more because they held more senior positions in the company, not because of their sex. Langenbach puts forth no evidence of a male employee holding the position of Assistant Manager at a non-metro Wal-Mart store who was paid more than her. In fact, she cites Tabasky as a male comparator, but he actually made less than Langenbach when he held the position of Assistant Manager. (Pl.'s Br. at 24.)

Finally, Langenbach cannot establish a *prima facie* case that she was terminated based on her sex. As discussed above, the undisputed evidence indicates that Langenbach was not meeting her employer's legitimate expectations.

## CONCLUSION

Langenbach has offered no evidence from which a reasonable jury could conclude that Wal-Mart interfered with her rights under the FMLA, retaliated against her for exercising her rights under the FMLA, or discriminated against her based on her sex. As such, Wal-Mart's motion for summary judgment is granted.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that Defendant's Motion for Summary Judgment (Docket # 35) is **GRANTED**.

30

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 23rd day of December, 2013.

BY THE COURT:

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge